1  Matthew Lewitz, Esq. (SBN 325379)
   E-mail: mlewitz@cozen.com
2  COZEN O'CONNOR
   401 Wilshire Boulevard, Suite 850
3  Santa Monica, CA 90401
   Telephone: 310.393.4000
4  Facsimile: 310.394.4700

5  Attorney for Plaintiff,
   Darktrace Holdings Limited
6

7

8              IN THE UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10

11 DARKTRACE HOLDINGS LIMITED, a          Case No.: 23-8993
   private limited company, registered in
12 England and Wales,                     **COMPLAINT**

13          Plaintiff,                     **1) Breach of Contract for Wrongful
                                               Termination of MCA**
14     vs.                                 **2) Breach of Contract**
                                           **3) Breach of the Implied Covenant
15 SOLERA HOLDINGS, INC., a Delaware          of Good Faith and Fair Dealing**
   corporation; and DOES 1-10, inclusive,  **4) Declaratory Relief**
16
            Defendants.                    **DEMAND FOR JURY TRIAL**
17

18

19

20          COMES NOW Plaintiff Darktrace Holdings Limited ("Darktrace"), a private

21 limited company registered in England and Wales, by and through its undersigned

22 counsel, and alleges and complains as follows:

23                          **INTRODUCTION**

24          1.     Beginning in February 2020, Darktrace began providing cybersecurity

25 software and various related cybersecurity services to Defendant Solera Holdings,

26 Inc. ("Solera") (Darktrace and Solera are collectively the "Parties").

27          2.     The Parties memorialized Darktrace's offering of hardware, software,

28 and support services to Solera through a Master Customer Agreement, fully

executed on February 7, 2020 (the "MCA").

3.     To facilitate optimal use of Darktrace's cybersecurity products, its customers, like Solera, must act cooperatively to support installation and configuration of Darktrace's proprietary software, which is deployed via either a team of on-site Darktrace support engineers or through the "cloud."

4.     While Darktrace and Solera initially maintained a fruitful business arrangement, their relationship was placed under assault and began to sour when Solera's prior executives who entered into the MCA on Solera's behalf left the company in or around September 2020.

5.     Thereafter, Solera's new management had unscrupulous ideas and intentions in mind.  In pre-textual fashion, Solera opportunistically sought to terminate the MCA based on the alleged existence of manufactured delays and product installation difficulties.  Ironically, however, it was Solera's obstructionist, bad faith behavior that directly caused any delays and thwarted Darktrace from completing installation and configuration of its cybersecurity software for Solera's benefit.

6.     Solera's actions caused the installation process of Darktrace's software and hardware to be unnecessarily and avoidably delayed.  Over the course of a two (2) year period, Solera shuffled Darktrace between more than four different purported "Project Leads" at Solera, many of whom were located on different continents, and each requesting that Darktrace prioritize different installations or adhere to different timelines. This inconsistent and rather clumsy approach, combined with Solera's frequent refusal to allow Darktrace to address any purported issues that arose during installation, prevented Darktrace from facilitating a seamless installation for Solera, as it normally does for its other customers.

7.     Consistent with its pre-textual approach and absent contractual entitlement, Solera audaciously wrongfully attempted to terminate the MCA, contending that Darktrace was in material breach thereof based on an alleged failure

to satisfy its obligations vis-à-vis its hardware, software, and service warranties.

8.     Such purported termination was improper because, *inter alia*, the MCA could only be terminated upon an actual and material breach and only *after* the alleged breaching party receives written notice of such breach and is provided a thirty (30) day period thereafter to cure any alleged breaches.

9.     Darktrace did not, in fact, breach the MCA or any of the product orders entered into with Solera thereunder.

10.     Against this backdrop, Darktrace brings the instant action seeking to, among other things, confirm the improper, attempted termination of the MCA by Solera.

## **PARTIES**

11.     Darktrace is a private limited company registered in England and Wales with its principal place of business located at Maurice Wilkes Building, Cowley Road, Cambridge, CB4 0DS, United Kingdom.  Darktrace also maintains offices across the world, including in Los Angeles, California.

12.     Defendant Solera is a Delaware corporation with its principal place of business located at 1500 Solana Blvd., Building #6 Suite #6300 (3rd floor), Westlake, Texas 76262 United States of America.

13.     The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants named herein as DOES 1 through 10 inclusive, are unknown to Darktrace who therefore sues said defendants by such fictitious names. Darktrace is informed and believes, and thereon alleges, that each of the defendants designated herein, including those designated as a DOE defendant, are agents or employees of one another, co-conspirators, and/or are legally responsible in some manner for the acts, omissions, and events alleged herein an proximately caused damages and injury to Darktrace, as described herein.  Darktrace will seek leave to amend this Complaint to show the true names and capacities of such fictitiously named defendants when the same have been ascertained.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §
1332(a)(2) as complete diversity exists between the parties – Darktrace, a citizen of
a foreign state, and Solera, a citizen of Delaware and Texas – and the amount in
controversy exceeds $75,000.

15.     The Parties consented to the jurisdiction of the federal courts of the
State of California, including the venue of this Court, in the MCA: "This Agreement
will be governed by and construed in accordance with the laws of the State of
California and the federal courts located in the State of California will have
exclusive jurisdiction to determine any disputes, which may arise out of, under, or in
connection with, this Agreement."  (MCA at § 16.9 ("<u>Governing Law</u>").)

**FACTUAL BACKGROUND**

**A.     The Parties' MCA**

16.     On February 7, 2020, Darktrace and Solera entered into the MCA.

17.     With respect to the term of the MCA, the Parties agreed that the MCA
would remain in effect until expiration of four (4) weeks after Solera's receipt of the
Offering or the end of the term specified in a separate "Product Order Form" to be
entered into by the Parties under the auspices of the MCA.

18.     Under the MCA, Darktrace would agree to provide to Solera software,
or software combined with hardware, as well as support services and training (the
"Offering"), which Offering would be set forth and described in further detail in a
separate "Product Order Form."

19.     By its express terms, the MCA governed and would apply to any sale,
license, or delivery of any software, hardware, support services, and training
provided to or rendered by Darktrace, as well as any "Product Order Form" entered
into between Darktrace and Solera.

20.     In consideration of the fees paid by Solera to Darktrace for the
"Offering," and subject to the terms and conditions of the MCA and the "Product

Order Form," Darktrace granted to Solera a non-exclusive, non-transferable, and non-sublicenseable license to (1) install and use the hardware and software at Solera's premises for Solera's or its affiliate's internal business purposes; (2) make a commercially reasonable number of copies of user manuals, installation guides, service descriptions, and other written specifications concerning the Offering (the "Documentation"); and (3) use REPORTS, and reproduce and distribute such reports, internally solely for Solera's or its affiliate's own business purposes.

21.     Pursuant to Section 6.1 of the MCA, Darktrace agreed to conduct its standard installation and test procedures to confirm completion of the installation of any software, or hardware with installed software, on Solera's or its outside third-party's site.

22.     Further, in accordance with Section 6.2 of the MCA, Darktrace agreed to provide "Standard Support Services" and any additional support services more fully specified in a Product Order Form.

23.     Under Section 7.1 of the MCA, the Parties agreed that Darktrace's fees for any Offering would be stated in a separate Product Order Form, and that Solera would be invoiced for such fees from the "Commencement Date" as defined and identified in a the Product Order Form.  The MCA provides for various warranties regarding Darktrace's hardware and software.  Specifically, Section 9.1 provides that, during the three (3) year period from the date of delivery of the Offering, Darktrace's hardware will perform materially in accordance with Darktrace's user manuals comprised of installation guides, service descriptions, technical specifications, and related files provided or otherwise made available by Darktrace (the "Documentation").  Similarly, Section 9.2 of the MCA provides that, during a period of ninety (90) days from the date of delivery of the Offering, Darktrace's software will perform materially in accordance with the Documentation.

24.     Notably, however, the aforementioned warranties set forth in Sections 9.1 and 9.2 of the MCA do not apply if:

"(i) [Solera's] use of the Offering is not in accordance
with th[e] [MCA]; (ii) [Solera] fails to follow Darktrace's
environmental, installation, operation or maintenance
instructions or procedures in the Documentation; (iii) the
[Offering] has been subject to [Solera's] (or its agent's)
abuse, negligence, improper storage, servicing or
operation (including without limitation use with
incompatible equipment), reasonable wear and tear
excepted; (iv) the [Offering] has been modified, repaired
or improperly installed other than by Darktrace or any
contractor or subcontractor of Darktrace; (v) "[Solera] (or
its agent) has failed to implement, or to allow Darktrace or
its agent to implement, any corrections or modifications to
the Offering made available to [Solera] by Darktrace; or
(vi) [Solera] (or its agent) has combined the [Offering]
with other software, services, or products that are not
provided by Darktrace or not otherwise specified in the
Documentation, and, but for such combination, the breach
of warranty would have been avoided."  (MCA at § 9.4
("Exceptions").)

25.     Darktrace further expressly disclaimed the existence of any other
conditions, representations, or warranties with respect to the MCA and, in so doing,
expressly acknowledged that the Offering would not be error-free or uninterrupted:

"EXCEPT FOR THE EXPRESS WARRANTIES SET
OUT IN THIS AGREEMENT, AND TO THE FULLEST
EXTENT PERMITTED BY LAW, NEITHER
DARKTRACE NOR ANY OF ITS THIRD PARTY
LICENSORS OR SUPPLIERS MAKE ANY

6
COMPLAINT

WARRANTIES, CONDITIONS, UNDERTAKINGS, OR
REPRESENTATIONS OF ANY KIND, EITHER
EXPRESS OR IMPLIED, STATUTORY OR
OTHERWISE IN RELATION TO ANY SUBJECT
MATTER OF THIS AGREEMENT, INCLUDING
WITHOUT LIMITATION ANY IMPLIED
WARRANTIES OR CONDITIONS OF
MERCHANTABILITY, SATISFACTORY QUALITY,
FITNESS FOR A PARTICULAR PURPOSE, NON-
INFRINGEMENT OR ARISING FROM COURSE OF
PERFORMANCE, DEALING, USAGE, OR TRADE.
DARKTRACE DOES N OT WARRANT THAT THE
OPERATION OF THE OFFERING WILL BE ERROR-
FREE OR UNINTERRUPTED." (MCA at § 9.6
("DISCLAIMER").)

26.     While the MCA conferred Darktrace with the authority to terminate the MCA under various contemplated scenarios, it entitled Solera to terminate the MCA under limited circumstances.

27.     Specifically, Section 13.3 of the MCA provides that "[e]ither Party may terminate this Agreement if (i) the other Party is in material breach of the Agreement and fails to cure such breach within thirty (30) days after receipt of written notice; or (ii) the other Party ceases its business operations or becomes subject to insolvency proceedings, which proceedings are not dismissed within thirty (30) days."

**B.     The January 2020 Product Order Form**

28.     Prior to, though in anticipation of, execution of the MCA, Darktrace and Solera entered into a Product Order Form effective January 16, 2020 ("the January 2020 POF").

29.     Under the January 2020 POF, Solera contracted with Darktrace to purchase the "Enterprise Immune System," comprised of Darktrace's proprietary Antigena Email Software, Software SaaS-0365, SaaS-SalesF, and SaaS-Splunk.

30.     Pursuant to the terms of the January 2020 POF, Solera's license for the Enterprise Immune System would commence on April 1, 2020 and would continue for a period of fifty-one (51) months.

31.     Under the January 2020 POF, Darktrace agreed to provide the "Enterprise Immune System" to Solera free of charge for the first three (3) months of the 51-month term, with Solera agreeing to pay an annual fee of Seven Hundred Thousand Dollars ($700,000.00) thereafter.

32.     Under the January 2020 POF, Solera also agreed to pay an annual fee of Two Hundred Ninety-Five Thousand Two Hundred Thirty-Four Dollars ($295,234.00) for Darktrace's Antigena Email Software.

33.     Taken together, and accounting for the initial three-month offering of the "Enterprise Immune System" free of charge, Solera agreed to pay a total annual fee of Nine Hundred Ninety-Five Thousand Two Hundred Thirty-Four Dollars ($995,234.00) to Darktrace under the January 2020 POF, which included installation services, standard support services, and on-site training.

**C.      Darktrace Commences Deployment and Installation on Solera's Behalf in Accordance with the January 2020 POF**

34.     Early after execution of the MCA, and in the midst of Darktrace's attempts to carry out its obligations under the MCA, Darktrace was made aware that Solera's network team was stretched thin, had limited resources, had other priorities, and could not—or would not—dedicate time, money, or labor to allow Darktrace to perform its services.  Darktrace was prepared to undergo efforts to meet Solera's needs regardless.

35.     For instance, Darktrace works with many large, international clients with complex, high-bandwidth networks requiring network taps or aggregation

devices.  Solera, however, refused to acquire what was necessary for Darktrace to deploy in Solera's environment.  In good faith, Darktrace worked with a networking partner to provide hardware to Solera's Las Vegas data center.

36.     Despite the foregoing issues, by April 2020, Darktrace had installed the Westlake, Texas DCIP-X2 Appliance, performed a User Interface Familiarization Training with Solera's Security Team, and had created an AGE Instance that was already running in Passive Mode.

37.     By June 18, 2020 Darktrace's HyperQuest appliance was fully operational.

38.     By July 2020 the SalesForce and Office 365 programs had been deployed and accounts were created, the Antigena Test Group had been created and was working in Active Mode, and Darktrace was already performing work to tune the Custom Model for the Antigena software.

39.     Darktrace's initial progress was ultimately curtailed when, in September 2020, practically all of Solera's management team who executed the MCA and January 2020 POF, and helped spearhead the roll-out and installation thereunder, departed Solera.

40.     Since that development, it became clear to Darktrace that Solera's incoming executives did not wish to honor Solera's obligations under, and in fact sought to extract Solera from, both the MCA and January 2020 POF.

41.     Nonetheless, over the course of the next eighteen (18) months, Darktrace continued its diligent efforts to install and implement the Enterprise Immune System for Solera's benefit. Despite these efforts, Solera's employees consistently prevented Darktrace from troubleshooting purported issues with the system.

42.     In Fall 2020, Solera re-assigned responsibility for installation under the MCA from a Project Lead based in the United States to a Project Lead located in Zurich, Switzerland.

43.     Subsequent to the aforementioned change in Solera leadership and the changes in Solera's Project Leads, Solera began to cancel the bi-weekly meetings it previously held with Darktrace under the pretext of prioritizing other work. Simultaneously, Darktrace began to experience increased difficulty, among other things, receiving feedback on its service proposals.

44.     In Spring 2021, Solera's Project Lead changed for a second time, with the project now being led by a Solera employee located in Spain.

45.     Despite the multiple changes in Project Lead, Darktrace continued to attempt to complete the project efficiently. On March 25, 2021 Darktrace completed the Consolidation Plan, as confirmed by Solera's Vice President of Cyber.

46.     In April 2021, Darktrace contacted Solera in an attempt to complete configuration of the Darktrace hardware located in Las Vegas, Nevada.  Regrettably, Solera did not respond to Darktrace's requests.

47.     In June 2021, Darktrace contacted Solera's Vice President of Cyber informing him that they were having issues with Solera's responsiveness and needed further assistance in the deployment of Darktrace's product. Solera's Vice President of Cyber acknowledged Solera's lack of responsiveness, especially as it related to the Las Vegas data center concerns, and promised that these issues would be rectified.

48.     Nonetheless, in July 2021, Solera still had not allowed Darktrace to complete its deployment of the Las Vegas data center.

49.     In Fall 2021, Solera's Project Lead changed for a third time, with "Project Lead" duties now being split between a Solera employee based in Mexico and a Solera employee in Spain.  This change in Project Lead exacerbated the already ongoing problems with responsiveness and assistance Darktrace had been experiencing with Solera.

50.     In Fall 2021, Solera decommissioned the Ann Arbor appliance and destroyed it without warning.

51.     In October 2021, Darktrace's Chief Technical Officer for the Americas, Eloy Avila, informed Solera's Vice President of Cyber that they needed to work together to get the product fully deployed, yet Solera's Vice President of Cyber never replied. Shortly thereafter, the Project Lead at Solera changed for yet a fourth time.

52.     Despite this, by January 13, 2022, the Las Vegas data center had been connected, but needed additional steps to complete it. When Darktrace informed Solera of the work needed, Solera did not approve it.

53.     By March 2022, Solera's interference with Darktrace's ability to install and implement the software in accordance with the terms of the MCA and January 2020 POF became more explicit and heightened.

54.     On March 22, 2022, Mr. Avila emailed John Suchecki at Solera to inform that he "[was] recently [] involved in several conversations between [thei]r respective teams and ha[s] concluded that an executive intervention is required, as progress has seemingly stalled."

55.     Nine days later, on March 31, 2022, Mr. Suchecki laid the groundwork for Solera's bad faith attempt to terminate the MCA and January 2020 POF, stating that "frankly we have been working with you guys for a year and we still cannot get your solution to scale and work in our environment."

56.     The two executives, Mr. Avila and Mr. Suchecki, had a phone call on April 12, 2022 to discuss how to better implement and onboard Darktrace's products.  During this call, Mr. Avila pointed out that many of the solutions which Solera requested had already been implemented, and that any failures were due to Solera's lack of support.

57.     On April 20, 2022 Mr. Avila sought to clear the air with Solera and summarized his April 12, 2022 call with Mr. Suchecki via email as follows:

> "I want to again note that we strongly disagree that our
> solution cannot scale to meet Solera's purchased coverage.

We contend that our solution could have already been implemented and working effectively for you if we had been given the necessary support from the Solera infrastructure team to do so. I want to reaffirm our commitment to getting the Darktrace deployment completed for Solera. We remain willing and able to complete the remaining portions of the deployment and, as always, remain ready and willing to do so, but we need your support to access Solera's infrastructure resources."

58.    Consistent with Darktrace's continued support of Solera and in an effort to extend an "olive branch" to Solera, Mr. Avila offered to extend the Enterprise Immune System to Solera for six months at no additional charge.

59.    Mr. Avila did not receive the courtesy of a response to his April 20, 2022 email correspondence.

60.    By May 13, 2022, it became clear that several of Darktrace's appliances which Solera needed to finish implementing had been stored on Solera's premises awaiting installation for some time, and that it was in fact Solera who had been not allowing the implementation to be completed.

**D.    Solera Manufactures a Supposed "Breach" and Purports to Terminate the MCA**

61.    Having already laid the breadcrumbs for its concocted theory that Darktrace failed to perform under the MCA, Solera ultimately "doubled-down" in seeking to terminate the MCA and the January 2020 POF.

62.    On June 17, 2022, and without providing any credible evidence or legitimate explanation, counsel for Solera sent letter correspondence to Darktrace alleging that Darktrace was in material breach of the MCA (the "June 17, 2022 Letter").

63.     In the most generic and conclusory fashion, the June 17, 2022 Letter purported to identify Darktrace's alleged "breaches" of the MCA and January 2020 POF as being based on Darktrace's alleged failure to provide hardware, software and services that conformed with the requirements of the MCA, and based on Darktrace's alleged failure to provide appropriate and conforming remedies in connection with the warranties set forth in the MCA. As set forth above, these assertions were pretextual in nature, as to date, Darktrace had performed all material requirements and obligations owed to Solera, to the extent their efforts to do so were not thwarted by Solera's misconduct.

64.     In any event, rather than articulate the specific issues about which Solera was complaining in its June 17, 2022 Letter, Solera indolently referred Darktrace to the apparent communications between the Parties' respective technical teams.

65.     As such, Solera failed to afford Darktrace a meaningful, much less actual, opportunity to cure any purported breaches in accordance with the terms of the MCA.

66.     In the June 17, 2022 Letter, and notwithstanding the absence of any material breaches on the part of Darktrace and Solera's non-compliance with the 30-day notice and cure period, Solera indicated its intention to terminate the MCA and January 2020 POF effective July 18, 2022.

67.     Notwithstanding that Solera appeared to have one foot out the door, Solera continued to request work by Darktrace.

68.     Conversely, despite the unwarranted animosity from Solera, and Solera's continued lack of cooperation, Darktrace's employees continued to work to implement its hardware and software products for Solera's benefit.

# FIRST CAUSE OF ACTION

## (Breach of Contract for Wrongful Termination of MCA)

## (Against Defendant Solera and DOES 1-10)

69.     Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation contained in Paragraphs 1 to 68 above.

70.     Darktrace has fully performed all obligations, covenants, promises and conditions required of it pursuant to the MCA and POF, except to the extent Darktrace's performance has been excused, waived, or prevented by virtue of Solera's conduct.

71.     Solera has failed to perform its obligations under and has breached the MCA by, among other things, purporting to terminate the MCA in violation of the express terms of Section 13.3 of the MCA.

72.     Section 13.3 of the MCA provides that Solera may only terminate the MCA if Darktrace "is in material breach of the Agreement and fails to cure such breach within thirty (30) days after receipt of written notice" or in the event of conditions that are not otherwise applicable.

73.     Solera's sham breach allegations referenced in its June 17, 2022 Letter to Darktrace do not support a proper termination of the MCA.

74.     Solera never offered evidence or provided notice of any material breach and, thus, never afforded Darktrace a meaningful opportunity to cure.

75.     Darktrace has demanded that Solera comply with the terms of the MCA to no avail.

76.     Darktrace is entitled to specific performance of the terms of the MCA, including, but not limited to, requiring Solera to pay all fees owed to Darktrace as contemplated under the terms of the MCA.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

### (Against Defendant Solera and DOES 1-10)

77.     Darktrace repeats, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 68 above as if fully set forth herein.

78.     Darktrace has fully performed all obligations, covenants, promises and conditions required of it pursuant to the MCA and POF, except to the extent Darktrace's performance has been excused, waived, or prevented by virtue of Solera's conduct.

79.     Solera has failed to perform its obligations under and has breached the MCA by purporting to terminate the MCA in violation of the express terms of Section 13.3 of the MCA.

80.     Section 13.3 of the MCA provides that Solera may only terminate the MCA if Darktrace "is in material breach of the Agreement and fails to cure such breach within thirty (30) days after receipt of written notice" or in the event of conditions that are not otherwise applicable.

81.     Solera's sham breach allegations referenced in its June 17, 2022 Letter to Darktrace do not support a proper termination of the MCA.

82.     Solera never offered evidence or provided notice of any material breach and, thus, never afforded Darktrace a meaningful opportunity to cure.

83.     Solera also failed to perform its obligations and has breached the MCA by refusing to cooperate with and make payments to Darktrace for the remainder of the fifty-one (51) month term of the MCA and POF.

84.      As a direct, foreseeable, and proximate result of Solera's wrongful conduct, Darktrace has been damaged in an amount to be determined at trial, but not less than $995,234.00.

## THIRD CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

### (As Against Solera and DOES 1-10)

85.     Darktrace repeats, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 68 above as if fully set forth herein.

86.     The MCA contains an implied covenant of good faith and fair dealing requiring that Solera not do anything to frustrate Darktrace's ability to carry out the installation of hardware and software and related services required of it thereunder.

87.     Further, the MCA contains an implied covenant of good faith and fair dealing that Solera would deal fairly and in good faith with Darktrace such that Solera would reasonably and fairly perform its respective obligations under the MCA.

88.     Solera repeatedly and materially breached the implied covenant of good faith and fair dealing by engaging in conduct purposefully aimed at frustrating Darktrace's ability to conduct its business, and specifically its provision of equipment and services for Solera's benefit under the MCA.  Such breaches include, but are not limited to, the invention and manufacture of disputes over the Parties' respective rights, obligations, and interests under the MCA, Solera's use of obstructive tactics to prevent Darktrace from carrying out a seamless and streamlined configuration of its software for Solera's benefit, and attempts to terminate the MCA without proper justification and/or notice.

89.     As a direct, foreseeable, and proximate result of Solera's wrongful conduct, Darktrace has been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Declaratory Relief)

### (As Against Solera and DOES -10)

90.     Darktrace repeats, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 68 above as if fully set forth herein.

91.     Pursuant to 28 U.S.C § 2201, this Court may declare the rights and legal relations of any interested parties seeking such declaration, whether or not further relief is sought or could be sought.

92.     There exists an actual, substantial controversy of sufficient immediacy between Darktrace, on one hand, and Solera, on the other hand, to warrant the issuance of declaratory relief.

93.     Specifically, an actual dispute has arisen and there is an actual controversy between Darktrace and Solera concerning the ongoing existence and enforceability of the MCA, including whether Solera validly and effectively terminated the MCA.

94.     A declaration is necessary and appropriate at this time in order to resolve the foregoing disputes regarding the Parties' respective rights, duties, obligations, and interests under the MCA, including a declaration as to whether Solera validly and effectively terminated the MCA

95.     Accordingly, Darktrace seeks a determination as to Darktrace's and Solera's continuing rights, duties, obligations, and interests under the MCA, including a declaration that Solera improperly and invalidly terminated the MCA, and that the MCA remains in full force and effect.

## **PRAYER FOR RELIEF**

Plaintiff Darktrace prays for judgment as follows:

1.     A Declaration that Solera's attempt to terminate the MCA and January 2020 POF was improper and that the MCA and January 2020 POF remains in full force and effect;

2.     Compensatory damages for Solera's breach of contract in an amount to be proven at trial, but not less than $995,234.00;

3.     An Order directing Solera to perform its obligations under the MCA and January 2020 POF, including, but not limited to, requiring Solera to pay all fees owed to Darktrace pursuant to the terms of the MCA and January 2020 POF;

4.     Interest as provided by law, including but not limited to pre-judgment and post-judgment interest;

5.     For such other and further relief as the Court may deem proper.

Dated:     October 24, 2023              COZEN O'CONNOR


By: _____
       Matthew Lewitz, Esq.
       Attorneys for Plaintiff
       Darktrace Holdings Limited

# **JURY DEMAND**

Darktrace Holdings Limited hereby demands a trial by jury on all issues upon which trial by jury may be had.

Dated:    October 24, 2023          COZEN O'CONNOR


By: _____
       Matthew Lewitz, Esq.
       Attorneys for Plaintiff
       Darktrace Holdings Limited

19
COMPLAINT